## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2024-KA-01116-COA

**D'BYRON DELANO RODGERS A/K/A**               **APPELLANT**
**D'BYRON RODGERS**

**v.**

**STATE OF MISSISSIPPI**                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/19/2024 |
| TRIAL JUDGE: | HON. KELLY LEE MIMS |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | STACY L. FERRARO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | JASON D. HERRING |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/02/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McCARTY AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. D'Byron Rodgers was convicted in the Monroe County Circuit Court for possessing a firearm as a felon. Rodgers appealed, arguing that the State failed to prove that he possessed the firearm on the date alleged in the indictment. For the reasons discussed below, we find no error and affirm.

### FACTS AND PROCEDURAL HISTORY

¶2. On March 9, 2018, a Monroe County grand jury returned a two-count indictment against Rodgers. Count I alleged that "on or about the 9th of July 2017, [Rodgers] willfully,

unlawfully and feloniously . . . kill[ed] Laquinton Walker" in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2017). Count II alleged that "on or about July 9, 2017," Rodgers "willfully, unlawfully and feloniously posse[ssed] a weapon, a Taurus 9mm pistol," despite having been previously convicted of a felony, a violation of Mississippi Code Annotated section 97-37-5 (Rev. 2014). The jury later acquitted Rodgers of the murder charge and found him guilty of the firearm charge.

¶3.    On July 9, 2017, Walker's body was discovered lying beneath a tree on Lowndes Street in Aberdeen. Law enforcement recovered a 9mm shell casing under Walker's body. Law enforcement developed Rodgers as a suspect, and he was arrested and charged with Walker's murder and possession of a firearm as a felon.

¶4.    Rodgers proceeded to trial in June 2024.[1] Rodgers's cousin Tylan McMillian testified that he owned a Taurus 9mm pistol at the time of Walker's death and had loaned the gun to Rodgers shortly beforehand. Although McMillian could not recall the exact date he gave Rodgers the gun, McMillian testified it was "somewhere around" July 4. After being asked why he loaned Rodgers the gun, McMillian stated, "[B]ecause [Rodgers] asked for it."

¶5.    McMillian could not remember if he had given Rodgers the gun directly or if Rodgers picked it up. However, McMillian could recall that he left Aberdeen "around July 4th," and he asked a family member to retrieve the gun from Rodgers. According to McMillian, the

---

[1] Trial was originally scheduled for October 2019, but the case was continued for years due to various motions filed by Rodgers and the State.

gun had been returned to him and was back in his car by July 8.

¶6.     McMillian was not in town on the date of the murder, but when questioned, he stated that Rodgers would have been able to access the vehicle on July 8 if Rodgers chose to do so because McMillian's car was parked at their grandmother's home. McMillian testified that the gun was in his vehicle on July 8 when he went to a casino out of town and was there when he returned on July 9. He further testified that when he returned to his vehicle, the gun was where he had left it, and he saw nothing to indicate that the gun had been used or moved while he was at the casino.

¶7.     McMillian went on to say that upon leaving the casino on the morning of July 9, he received several calls from family members telling him that Walker had been killed and that Rodgers might have done it. McMillian testified that once he heard those rumors, he called Rodgers to ask if he (Rodgers) had killed Walker. Rodgers denied any involvement.

¶8.     McMillian later voluntarily surrendered his gun to law enforcement.[2] Later testimony from an expert in firearms and toolmarks at the Mississippi Forensics Laboratory revealed that the shell casing recovered from underneath Walker's body was a match for McMillian's Taurus 9mm.

¶9.     Jannoris Blanchard also testified that he had seen Rodgers with a gun "[a]round" July 4. Initially, Blanchard testified that he could not describe the gun and did not know who

---

[2] Although undoubtedly beneficial to the investigation, it was unclear why McMillian surrendered his gun to law enforcement because he testified that he had no reason to believe that his gun was the gun that was used to kill Walker.

owned it. However, Blanchard refreshed his memory with a written statement he had given the Aberdeen Police Department a month after the murder. In his statement, Blanchard wrote, "I had Tylan McMillian['s] black 9mm from D'Bryon Rodgers for a moment on July 4, 2017, and returned [it] right back to him. I haven't seen it since[.]" Blanchard agreed that the written statement was accurate and truthful, and it was admitted into evidence.

¶10. Following Blanchard's testimony, the State moved to amend Count II of the indictment to read "between July 4 and July 9" instead of "on or about July 9." The State argued that the change was one of form, not substance, since Rodgers failed to file any affirmative alibi defense. Rodgers objected, arguing that the proposed amendment went to the substance of the indictment. The circuit court agreed with Rodgers and reasoned that the proposed change would be to substance, not form, because "possession of a firearm [wa]s linked to an event that occurred on the 9th of July."

¶11. The State next called Anderson Strong to testify. Strong was a cousin of both Rodgers and Walker and lived near both men. Strong testified that he had been out at a club with Walker on July 8, and after leaving, the two returned to Strong's mother's home. Once they arrived, Walker asked Strong for a ride back to his own house, but Strong refused, saying he was "over [his] limit" and "couldn't drive." According to Strong, Walker then left "around 1:00 [or] 2:00 in the morning," and "about fifteen to twenty minutes [later]," Strong heard a gunshot. Strong testified that he did not investigate the noise because gunshots were not unusual in the area, and "[at] that time of the morning people are out shooting."

4

¶12.    Strong stated that he remained at his mother's house until roughly 5:00 a.m., when he left to drive around the neighborhood. Strong testified that he "kept seeing [Rodgers] on every block," and he saw no one else that morning. Strong saw Rodgers again around 7:00 a.m. Strong testified that he was getting in his car when Rodgers approached him. Strong said that Rodgers appeared to have come from the direction of Walker's body. According to Strong, Rodgers had been "walking up that strip where Laquinton [Walker] was laying at."

¶13.    Strong testified that Rodgers asked if he had seen "the dead body over there." Strong stated that after hearing this, he repeatedly asked Rodgers "[W]hat body," and "[H]ow [do] you know he [is] dead." Strong said that Rodgers "just kept saying he knew that the body was dead." As the two approached the body, Strong recognized that it was Walker. Strong stated that he "panicked" and ran toward his sister's house, but Rodgers "was just standing there looking" at Walker. Strong testified that he and Rodgers were the only people outside at that time.

¶14.    Law enforcement interviewed Rodgers twice, and recordings of those interviews were admitted into evidence and played for the jury. During Rodgers's first interview with Aberdeen Police Chief Henry Randle,[3] Rodgers recounted the events leading up to his meeting with Strong on the morning of July 9 and denied any involvement in Walker's death. Rodgers also told Chief Randle that "people" were saying he killed Walker, but Rodgers

---

[3] Chief Randle died before trial, and the recordings of his interviews with Rodgers were admitted through another law enforcement officer.

5

maintained that he was not involved in Walker's death.

¶15.    Approximately six weeks later, Rodgers requested to speak with Chief Randle again, and a second interview was conducted. Rodgers explained that he wanted to speak with police again because "[McMillian was] on the streets saying he stole [McMillian's] gun" and used it to kill Walker on July 9. When asked why McMillian and others would accuse Rodgers of killing Walker, Rodgers stated that "the streets" had been saying he had been beaten up by Walker at a carwash and had threatened to kill Walker after the alleged altercation. However, Rodgers denied the story and maintained his innocence, telling Chief Randle he had "[not] seen or touched a pistol since July 5th."

¶16.    According to Rodgers, he was at his house on July 4 with several other people shooting McMillian's gun, but McMillian reclaimed the gun a short time later. Chief Randle asked Rodgers if he was on probation, and Rodgers admitted that he was. Chief Randle then questioned why Rodgers, a previously convicted felon who was prohibited by law from possessing a firearm, had possession of McMillian's gun just days before Walker's death. In response, Rodgers attempted to clarify that he never had actual possession of a gun and instead claimed that Blanchard had brought the gun to Rodgers's home. Rodgers told Chief Randle that he did not allow Blanchard to bring the gun inside his home. When Chief Randle challenged this statement, Rodgers maintained the gun never entered his home, telling police, "[I] buried it in hay" outside my house.

¶17.    After the State rested, Rodgers moved for a directed verdict on both counts, arguing

6

that the State failed to meet its burden of proof for either charge. Rodgers claimed that the State had presented "no evidence" to prove that he went to McMillian's car on the night of July 8, removed the gun, committed the crime, and then returned the gun before McMillian arrived back in Aberdeen on July 9. The court denied the motion, and the defense rested without calling any witnesses.

¶18. Following closing arguments, the jury found Rodgers not guilty of Walker's murder but found him guilty of being a felon in possession of a firearm. The next day, the circuit court sentenced Rodgers to ten years in the custody of the Mississippi Department of Corrections, with five years to serve and five years suspended, followed by five years of post-release supervision. Now, Rodgers appeals, challenging the sufficiency of the evidence.

**STANDARD OF REVIEW**

¶19. "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Collins v. State*, 304 So. 3d 685, 691 (¶19) (Miss. Ct. App. 2020). In this regard, "[t]he issue is not whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (quotation marks omitted). "Additionally, all inferences that may be reasonably drawn from the credible evidence of guilt are considered in the light most favorable to the State." *Billups v. State*, 270 So. 3d 917, 920 (¶6) (Miss. Ct. App. 2018).

**DISCUSSION**

¶20. On appeal, Rodgers claims that the State presented insufficient evidence to sustain his conviction of possessing a firearm. Rodgers stipulated to his status as a felon at trial, and he does not challenge on appeal the sufficiency of the evidence that he possessed a firearm. Rather, Rodgers argues that the State did not prove that he possessed the firearm on the date alleged in the indictment, "on or about July 9, 2017." Rodgers acknowledges that the jury heard evidence regarding his possession of a gun prior to July 9, but he argues that the only evidence provided to the jury about the gun's actual location on July 9 was that the gun was in McMillian's car when he left on July 8 and was still there when he returned on July 9. Although the indictment alleged that Rodgers possessed a gun "on or about July 9th," Rodgers argues that "[w]here the date and the charge are closely connected, specificity is critical." However, Rodgers is mistaken.

¶21. This Court has repeatedly recognized that "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment." *Carpenter v. State*, 400 So. 3d 493, 502 (¶30) (Miss. Ct. App. 2024). Moreover, "[the] failure to precisely prove an offense occurred during a specific time period is not grounds for reversal." *Mosby v. State*, 134 So. 3d 850, 853 (¶11) (Miss. Ct. App. 2014). Thus, "the dates proven at trial may 'within reasonable limits' vary from the date alleged in the indictment so long as the variance in dates does not unfairly prejudice the defendant." *Follett v. State*, 380 So. 3d 961, 972 (¶42) (Miss. Ct. App. 2024).

¶22. Further, "[o]ur Supreme Court recently reiterated that the State generally is not

required to prove an exact date, especially when the indictment alleges that the offense occurred 'on or about' a certain date." *Rasberry v. State*, 405 So. 3d 1281, 1288 (¶25) (Miss. Ct. App. 2025). In fact, "a period of two months [can be] within reasonable limits of, or reasonably near, the dates alleged in an indictment, especially when the indictment uses 'on or about' language." *Id.* The Supreme Court has also advised that courts "consider whether the defendant had adequate notice of the charge(s) against him so that he was able to prepare his defense and not be surprised at trial," when trying to determine whether the proof of when the crime occurred is within reasonable limits. *Ross v. State*, 288 So. 3d 317, 322 (¶18) (Miss. 2020).

¶23. Additionally, "[f]or a person to be convicted of unlawful possession of a firearm by a convicted felon, the State must prove: (1) the defendant was in possession of a firearm; and (2) the defendant had previously been convicted of a felony crime." *Billups*, 270 So. 3d at 920 (¶8).

¶24. Upon reviewing the record, we conclude that the jury was presented with sufficient evidence to find that Rodgers possessed a firearm "on or about July 9, 2017." As an initial matter, the parties stipulated to Rodgers's status as a convicted felon during trial. Therefore, this Court only needs to assess whether, "when view[ing] the evidence in the light most favorable to the State," "rational jurors could have found the State proved each element of the crime." *Collins*, 304 So. 3d at 691 (¶19). Here, the only element the State needed to prove was possession "on or about July 9, 2017."

9

¶25. As discussed above, "the dates proven at trial may 'within reasonable limits' vary from the date alleged in the indictment so long as the variance in dates does not unfairly prejudice the defendant." *Follett*, 380 So. 3d at 972 (¶42). Rodgers has not claimed that he suffered any unfair prejudice. Nor has he argued the date listed on the indictment provided him with inadequate notice of the charges against him or caused him surprise at trial. *See Ross*, 288 So. 3d at 322 (¶18).

¶26. Witnesses testified at trial, and Rodgers admitted in his interview, that he possessed a gun on July 4 and 5, 2017. Blanchard testified that he had seen Rodgers with a gun around July 4, and McMillian testified that he loaned Rodgers his gun around that same time. Rodgers also admitted that he possessed McMillian's gun on July 4 and 5. We find a variance here of four or five days between the date listed on the indictment—on or about July 9, 2017—and the dates proved at trial to be within "reasonable limits" as outlined in *Rasberry v. State*, 405 So. 3d 1281 (Miss. Ct. App. 2025).

**CONCLUSION**

¶27. When the evidence in the record is viewed "in the light most favorable to the State," we find that "rational juror[s] could have found the State proved each element of [Rodgers's] crime" with respect to felon in possession. *Collins*, 304 So. 3d at 691 (¶19). The State provided the jury with evidence in the form of witness testimony and Rodgers's recorded interviews. From that evidence, "reasonable jurors could rationally say that the State" proved Rodgers possessed a firearm "on or about July 9, 2017." Therefore, we affirm Rodgers's

10

conviction and sentence for Count II.

¶28.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WEDDLE, J., NOT PARTICIPATING.**